USDC SCAN INDEX SHEET










AXR    1/22/04    9:53

3:03-CV-00353    CRAWFORD V. SAN DIEGUITO UNION

*16*

*DECL.*

ERIC B. FREEDUS (SBN 61175)
FRANK AND FREEDUS, A P.C.
1202 Kettner Boulevard, Suite 6000
San Diego, California 92101-3344
(619) 239-3000 / Fax: 236-0217

Attorneys for Plaintiffs

04 JAN 21 PM 4:09

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL CRAWFORD, JEFF CRAWFORD AND FARZANEH CRAWFORD,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>SAN DIEGUITO UNION HIGH SCHOOL DISTRICT,<br><br>　　　　　Defendant. | CASE NO. 03 CV 0353 JH (JMA)<br><br>DECLARATION OF ERIC B. FREEDUS IN SUPPORT OF REQUEST FOR ATTORNEY'S FEES AND COSTS<br><br>Hearing: March 12, 2004<br><br>Judge: Honorable John A. Houston<br>Courtroom:<br>Magistrate Judge: Hon. Jan M. Adler<br>Courtroom: |

I, Eric B. Freedus, declare:

1. I have practiced law since 1974 in an active civil litigation practice including civil jury trials, over 100 judicial and contractual arbitrations, appellate arguments before California State Courts of Appeal and Special Education Due Process hearings. During those years, I have been the lead attorney on over 1000 civil cases including numerous matters involving closed head injuries, cognitive functioning disabilities and physical disabilities including paraplegia and quadriplegia.

2. Since 1992, I have handled and supervised the handling of cases brought under the Americans with Disabilities Act on an estimated 20 or more occasions.

3. I have sat as a Judge Pro Tem of the Superior Court of San Diego County, a Judicial Arbitrator, a mediator and an American Arbitration Association arbitrator.

4. I have handled matters under the I.D.E.A and corresponding state law since 1997. My individual practice is currently limited to special education matters. (I continue to supervise and consult with other attorneys in this firm in other areas and have on less than five occasions handled trials in larger exposure matters where the client of the firm specifically requested me to do so.)

5. In every matter in which fees were paid, including matters where settlements were reached prior to due process being filed or decision reached, matters where a decision was reached, and matters where an action was filed in Federal Court to recover attorney's fees after prevailing, the hourly rate claimed, and upon which fees were thereafter paid, was my then current hourly rate. A $300 per hour rate had been my standard rate for over three years. I raised my rate to $350 per hour between January 1, and July 1, 2003 and that my current rate.

6. I represent clients in San Diego, Riverside, Los Angeles and Orange Counties. My travel time is billed "one-way", i.e. one-half the full hourly rate.

7. A ten-year attorney in my firm is billed at $300 per hour on IDEA and ADA matters. My paralegal, who has been with the firm for 13 years, is currently billed at $115 per hour.

8. Fees at my $300 per hour rate have been paid to me prior to 2003 by the following school districts: San Diego Unified, Encinitas Union, Grossmont Union H.S., La Mesa- Spring Valley, Coronado Unified, Poway Unified, Oceanside Unified, Chula Vista Unified, Cajon Valley, San Dieguito Unified, Carlsbad Unified, Escondido Union H.S., Solana Beach Elementary, Long Beach Unified. Law firms representing those districts in those matters include Lozano Smith; Atkinson, Andelson, Loya, Ruud & Romo; Parker and Covert; and Best, Best & Krieger. The County of San Diego Department of Mental Health has also paid me fees at that hourly rate in special education matters.

9. Fees at my $350 per hour rate have been paid to me by the following school districts: San Diego Unified, Chula Vista Unified, Temecula Valley Unified, Long Beach Unified, Del Mar Union and Poway Unified.

10. I am familiar with the cost advanced and billing policy of our firm. The items appearing on the attached Statement for Legal Services Rendered Exhibit B under the heading

"Reimbursable Expenses " are true and accurate items and figures for cost advanced and expenses incurred in connection with the handling of the underlying due process. Any expense items for costs advanced are added to the clients "expense card" automatically as checks are written from the firm's general checking account. In addition, photocopies and postage are metered and are billed directly to the client by the five digit file number assigned to this case.

11. The firm's copy machine is attached to a meter which does not permit any copies to be made unless the user's identifying code and a five digit client number is entered into the meter. The copy meter is connected to the office computer system and the contents are "dumped" into the computer billing system and charged to the clients' files.

12. In late September 2002, the Crawford's prior attorney withdrew from the case and referred the matter to the undersigned. I advised the district by letter dated September 12, 2002 that the parents continue to reject the offer of placement and would be keeping their son at the nonpublic school. I advised that I would be out of the country until October 10, 2002 and would be in touch with the district upon my return. Shortly after that letter, I left for vacation.

13. On October 15, 2002, the district filed for due process against the parents seeking a determination that its offer of placement was appropriate for plaintiffs' son to return to the public school. In an attempt to see whether or not there was some possible middle ground that would be psychologically safe for the student, I contacted student's psychologist, Dr. Michel Perlman. Perlman was of the opinion that the student could handle one or two classes on the high school campus but that the remainder of his time would have to be spent in a smaller, safer environment such as the non-public school (NPS) where he was currently attending. Thereafter, according to Perlman, when and if student showed an ability to handle that stress level, more time would be spent on the high school campus and less time off the high school campus.

14. Based on the information I received from Dr. Perlman, on more than one occasion between the receipt of the filing and the first day of hearing on November 7, 2002, I tried to convince counsel for the district that this matter should be taken off the hearing calendar to permit the parties time to proceed to mediation to see if some settlement could be reached.

After realizing that the district had no interest in continuing to fund the NPS, I proposed in general that a transition plan could be established whereby the student would be "eased" back into the public school based upon Perlman's recommendations. Since the student was then attending the NPS, I suggested that a "dual enrollment" be established between both the public school and the NPS.

15. According to the district's counsel, the district wanted to get hearing as quickly as possible. The district's counsel advised that the district was not willing to go to mediation unless the parents waived their right to raise certain legal arguments. The parents were not willing to waive rights before mediation was even held, and the district refused to go to mediation or continue the hearing.

16. On November 7, 2002, the hearing began. As is the practice of the Hearing Officers, the parties were encouraged to make a last-minute effort to settle the matter. When the Hearing Officer learned at that the matter did not go to mediation, he engaged in a rather lengthy monologue of why mediation was advantageous to all concerned. A brief recess was held during which the district agreed to go to mediation. Thereafter, the Hearing Officer was advised on the record that the mediation would be to explore whether there was a way to create a safe transition for student onto the high school placement and that the Dr. Perlman's input was necessary on that subject. The plaintiffs thereafter paid Dr. Perlman to attend the mediation and provide input and advice in suggesting an appropriate transition plan. No settlement was reached.

17. During this time, the parents filed a separate due process action for against the district seeking reimbursement for the private placement they had made up to that point as well as any other equitable relief deemed appropriate by the Hearing Officer. By stipulation, the two actions were consolidated. (Since counter-complaints are not provided for by the administrative rules, this is the procedural "equivalent.")

18. The matter thereafter proceeded to hearing on November 19th through 21st and December 3, 2002. During the initial conference at which the issues were discussed, I stated the parents' position that the placement was inappropriate for the student at that time. I stated

1   the parents' position that the district's offer in the July 2002 IEP would have required student
2   to attend a full time program on a large campus without any transition plan by which he would
3   be transitioned from the smaller, safer campus to the larger high school campus. In addition,
4   parents contended that the IEP was inappropriate for him at that time since it did not meet his
5   needs.

6   19.   Dr. Perlman testified at length about why student could not at that time be safely placed
7   into a full time program as proposed by the district. Attached to the Points and Authorities as
8   Exhibit C are portions of the testimony of Dr. Perlman. Dr. Perlman testified that a full
9   academic load and a campus that large and populated would be dangerous and that student
10  needed to be transitioned from the NPS into a full time high school program gradually.

11  20.   Attached to the Points and Authorities as Exhibit G is a reprinted copy of the last page
12  of the parents' Closing Brief filed in the due process matter indicating the relief requested from
13  the hearing officer.

14  21.   The Hearing Officer decision explicitly found that the school district had not offered a
15  free appropriate public education because the district did not provide a statutorily required plan
16  to safely transition the student from the NPS to the public school. The Hearing Officer found
17  that the lack of transition plan constituted a denial of FAPE and ordered that the district hold an
18  IEP meeting within 30 days of the date of the decision, hire and pay Dr. Perlman to attend the
19  IEP meeting so that a transition plan could be developed. A excerpts from the decision are
20  attached to the Points and Authorities as Exhibit D.

21  22.   Thereafter, pursuant to the Hearing Officer's decision, an IEP meeting was held and an
22  IEP developed. Dr. Perlman attended and a transition plan was developed as ordered by the
23  hearing officer. A true and accurate copy of the IEP notes from the ordered meeting is attached
24  as Exhibit E.

25  23.   True and accurate copies of declarations from and pertaining to attorney's in the San
26  Diego, Orange and Los Angeles Counties are attached collectively to the Points and Authorities
27  as Exhibit A.
28

24.  A true and accurate copy of the invoice from Frank and Freedus, A Professional Corporation is attached to the Points and Authorities as Exhibit B. The items contained therein reflect time spent on and costs incurred in the handling of the Crawford due process proceeding by members and paralegal staff of the firm.

25.  A true and accurate copy of the hearing officer's decision is attached to the Points and Authorities as Exhibit D.

26.  A true and accurate copy of the Dr. Perlman's invoice is attached to the Points and Authorities as Exhibit F. The bottom two figures, $1,900 and $3,187.50 represent experts fees incurred in connection with the due process proceeding.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 19th January, 2004 at San Diego, California.

_____
ERIC B. FREEDUS